The United States Court of Appeals for the Federal Circuit is now open and in session. God Save the United States and an Honorable Court. You may be seated. Good morning everyone. The first argued case this morning is number 07-1450 In Re Basell Poliolefine. Mr. McRae. Good morning, Your Honors, and may it please the Court. Your Honors, my name is Warren McRae, and I'm an attorney in the New York office of the firm Loeb & Loeb. I represent the appellant here today, Basell Poliolefine. Your Honors, this is an appeal from a director-ordered re-examination of the NADA 687 patent. Now, there were two sets of rejections made. The first set of rejections was under section 102 and 103 based on a reference, allegedly intervening reference that was fully considered during original prosecution. And the second set of rejections is for obviousness type double patenting. There are very good reasons why both of these rejections should be reversed. Well, Mr. McRae, let me start in on the double patenting. Sure. There are so many quote references plus claims, we can't go through them all. Sure. But we're dealing with very close art here, and we're dealing with basically homologous monomers. For example, if I look at category E, because that encompasses all the claims just as a matter of economy, that's rejected as obvious over NADA 987 in view of three other NADAs. That's correct. So NADA 987 discloses a monomer of C3 and above. And they're looking at claims one and nine, and claim nine is a monomer, which includes carbon atoms four and up. And NADA 987 is a monomer consisting of propylene and butylene. So you're really talking about something that would seem to be very obvious in a homologous sense. And the same with claim nine, which, although it's monomeric, claim one is monomeric too. So these are all very close. Why isn't there a prima facie sound obviousness double patenting rejection? The reasons is, first, with respect to the 987 patent, that one was fully considered during original prosecution, and under the statute that controls this prosecution, that reference is not in play anymore, or should not be according to Portola and Recreative. But of course, they were overruled by Congress, right? Yes, that was, but the enactment of that statute was supposed to be, and what it says according to the public law is that it will be in play. New issues can be raised on old art after the enactment. And the MPEP guidelines and the board decision also states that they recognize, according to the public law, that any re-exam that was in play or started here, all the art of Portola and Recreative. But I thought the question of the Portola issue related to Vandenberg, a substantial new question of patentability, not your own references. It related to, no, it also related to, that rejection was actually changed. The board did not affirm the rejection over the 987 patent in view of several other patents. It only affirmed it over the 987 patent. And that argument fully applies in the brief to the 987 patent as well. Yeah, but those other patents are in play. Okay, so we need not consider these others, but they're still before us, aren't they? Well, they would be, the rejection would then be over multiple claims in making a single rejection. That's acceptable in obviousness. I don't think it's, from everything we have seen, and I think that's why the board actually did not affirm over the combination of several art pieces, several combinations of NADA claims. But to answer your question, why is it not obvious, one of the reasons, even if you are going to consider the 987 patent, would be that the bottom half of the claim is extremely broad with respect to the type of catalyst that can be used. And the claims in issue are very specific. Now, the question is whether that would render the NADA claims obvious. And the test has to be as the time the application was filed. Every piece of authority we have found states that it's a Graham analysis, and no piece of authority have we found states that it's not. So if the PTO, for example, like this court did in the Lilly case, there was a Lilly v. Barr. There was a claim to salt, and it was asserted against a claim to hydrochloride. Hydrochloride was clearly in the specification of the patent asserted, but this court did not go to that patent. Instead, it went to a prior art Merck index to show why hydrochloride would have been obvious. You can't read limitations in the claims and narrow them. Kaplan also stated the same thing. So if you look at the bottom half of the claim, it does not render any of the NADA claims obvious, and that's why the PTO impermissibly went to the specification. What is the bottom half of the claim, the catalyst? Yes, sir, Your Honor. But the catalysts are shown in the 987 patent. They're shown, but the claims aren't limited to them, and the question is whether the claim would have rendered obvious at the time the application was filed than any of the NADA claims. But even if the obviousness type double patenting rejection is sort of restricted to looking at the claim as the prior art and not to the patent, that doesn't foreclose reference to the patent for an understanding of what that claim says. That's true. That's true. Vogel says you can refer to what it says, but Vogel never read anything into any claim, and no case that we have found ever narrowed a claim. Kaplan says that you can't. General Foods didn't do that either, and this court didn't even do that in the Eli Lilly case. In this case, I understand you make an argument that the Graham factors have to be applied and they weren't. That's correct. And even if we agree that an obviousness type double patenting rejection does implicate the application of Graham factors, there was at least some recognition of the submitted art, the declarations, and while the board's opinion might have placed, say, more emphasis on policy issues of extending monopoly as opposed to Graham analysis kind of issues, nonetheless, the declarations were considered because they are referenced. Isn't it difficult for us to say, well, the board didn't consider them properly and didn't apply a Graham analysis simply because they might not have been as explicit in the opinion as you would have liked? Your Honor, I don't think that's quite correct. The only reason, repeatedly, that they rejected all of the declaration evidence was that they said the claims are enabled and therefore, and one would have seen that. So because they were enabled, one would have recognized that there's a reasonable expectation of success and suggestion of motivation. But the claims in issue didn't even exist in 1954. So they weren't enabled. And their board was using it as prior art. It never addressed why the declaration evidence was insufficient. Their argument that the claims are presumptively enabled, yes, they are. But by themselves, they don't have or they don't provide any sort of suggestion of motivation unless you want to take the whole patent at that point. But then you're using them as prior art. And as Kaplan said, you can't do that. You have to have some prior art to show why you would have made the modification. That's what kept Kaplan's clear on that point. I'm sorry. In any event. Continue. Okay. Just also in this regard, another important point is the two-way test, just to finish up with the double patenting. The PTO states that there was a delay in presenting a claim and that the delay is on the patentee for not presenting it earlier. The claim in issue that they say was presented late was to Ethylene and Butene. We were required to add it by Examiner Shoffer. Otherwise, we could not have been included in the interference in U.S. 2. It was added in U.S. 2. This is unlike Lilly where it was added in U.S. 4, just as an afterthought. Also, in U.S. 1, we had original claims, if you look at them, that actually were broader in many regards than the claim that was originally submitted in U.S. 2 as required by the PTO. The claims covered copolymers and homopolymers. With regard to the copolymer, they were very, very broad. With regard to the catalyst, they were very broad. But the claims that resembled the claims in question weren't presented until the interference, correct? Yes. They were required to be presented by the Examiner, by the PTO. That was some seven, eight, nine years after the priority date or the initial filing date? That is true. But the overlapping period, there was solid prosecution in both applications. There were no, for example, as an eMERG, file it, get a rejection, wait six months, refile it, get a rejection, wait six months. The co-pending period, there was active prosecutions all the way. The MPEP is clear that interferences are contested under 102G, and those are delays on the PTO. So we did what they said. We win the interference. That covers the whole overlapping period with respect to each of the four patents. Because of that, we should be allowed to have the two-way test, we believe. Mr. McRae, you were attempting to refute the obviousness rejection, partly on the basis that the older patents have generic recitations of the catalyst. Aren't there claims in this whole melange of issued patents here that are specific to titanium tetrachloride and aluminum tri-alkyl? The 496 patent is the only one that is specific. That's what I was looking for. And that would be relevant only to the independent claims. It wouldn't be relevant to the narrower claims that recite ethylene, the claims that require ethylene as a co-molecule. Well, we're talking about obviousness when you've got all this stuff lying around here, and you're trying to limit it only to certain other aspects of the claim. Well, that's what they had gone after ever since US-2, though, and they kept prosecuting it the whole way. It hasn't been an afterthought. This is something that they've been going after for quite some time. Like 40-something years. Your Honors, they never quit. They went up to the board several times. They went up to this court, solicitor asked for a remand about nine or ten years ago, and it was remanded. They opened prosecution, and we were able to get it out again a second time. In a matter of fairness, the client has fought every single day all the way. If I'd like to, well, I'm seeing down to about three minutes here. I believe that's my total time. I would just like to add also with respect to the rejections under Section 102 and 103 and also the 987 patent, since that now is a single reference alone and the PTO has acknowledged that, that one is out of play, and Vandenberg is out of play also. Also, even if that was not to be the case, the PTO, under the only case that we were able to find, Patlix v. Quigg, PTO is barred from raising issues under Section 112, entitlement to benefit specifically. They haven't cited a single case to the contrary that would allow them to do that. So they're trying to do it in a second way, saying that we're allowed to raise 112 issues. Let's hear from the office. Good morning. I have three specific answers to things that were raised by Mr. McRae. I can go through those real quickly. First of all, on the issue of whether the 987 patent was originally considered in prosecution, it's true. In the 1980s there was a double patenting rejection based on the 987 patent, but he overcame that double patenting rejection in part by amending the claims to make them more specific. I'm sorry, to make them more general. There was a limitation in the claim back in the 1980s to a specific titanium chloride catalyst. Tell me, why is the new statute on substantial new question of patentability not relied on? Was the effective date of that statute precluded being relevant here? The effective date, the statute itself clearly indicates that it applies to re-exams going forward from November 7, 2002. This one was initiated in June of 2002. Aren't you stuck with Portola then? Portola does, to some extent, govern this proceeding. We would suggest, especially given the legislative overruling of Portola, that Portola certainly not be- But not given. I mean, if that legislative overruling is off the table, you can't premise an argument and say, given that overruling. All I'm suggesting is that we don't expand Portola for that period, to which it admittedly does apply. Just to finish the thought of the 90- I'm not sure I understand. Either it is or it isn't applicable, and it seems clear from the statute that the statute is forward-looking only. That's correct. Portola is applicable. Then how does the office support citing references that were previously argued? It's a very different sort of situation. As the board explained, there are very unusual circumstances in this case. We've cited a piece of prior art, Vandenberg, which was not fully considered by the examiner who allowed the claims. The PTO did not consider that reference as prior art. But how about the 987? Okay, I'll return to the 987. I don't want to forget about Vandenberg, but let me just finish my thought on the 987. In that case, there was a rejection for double patenting. In the 1980s, based on the 987 patent, at a time when the application claims included a limitation to titanium chloride, he went and argued similar to the way he's arguing now that, oh, that's a very specific limitation. The 987 catalyst has such a broad teaching as to this catalyst that it wouldn't make the titanium chloride itself obvious. But the claim that was eventually allowed was titanium halide, which was a much broader class than the claim that was at issue when the 987 patent was originally considered in prosecution. Therefore, this rejection under the 987 was not overcome. It was a different claim. The rejection was overcome on the basis of that difference. So the position of the office is that you can't essentially treat the legislation as retroactive if, in fact, there's a different argument raised by the office? If there's a different claim before the office, then certainly. It wouldn't make sense. In other words, he amended the claim to make the double patenting rejection under 987 in the 1980s less strong. The examiner at that time had other rejections. So you're saying there was a substantial new question of patentability because the claims were different? Yes, that is the point. If the claims are different, how could it be double patenting? You have to say the claims are either so similar that one is obvious from the other, covered by the earlier patent. Is that also the office's position? Well, let me back up. Judge Lurie and I were only speaking of the difference in the claims in the patent application here. The claims he applied for in the 1980s were different than the ones he eventually got. Therefore, we're entitled to raise the same patent, the 987 patent, against these new claims, which are different with respect to the double patenting rejection under 987. I guess it's very hard to figure this out from the record, but you can listen to the tape of this. A4807 recites what Claim 11 was in the 1980s. It did include that titanium chloride limitation. Compare that with the current claims, Claim 1, which doesn't include that. And then you can see at A4832 in his argument where he makes a big deal of the fact that there was that titanium chloride limitation, which is no longer there. So that may have been the reason the examiner dropped that double patent. What about the argument that the conditions are not shown in the earlier patent? The significantly different polymerization temperature, for example. How does that affect the double patenting theory? Those limitations are essentially extraneous to the double patenting theory. In this case, the basic theory behind double patenting is, is the applicant going to get an unjustified, time-wise extension of his patent rights? Here, what we can do- Well, that clearly is the basic theory in the policy. One of the things that troubled me about the board's opinion is that they seem to premise or conclude their analysis of each issue with that policy point. And you don't decide cases based on policy. You decide the reason for the policy. You decide double patenting cases on the question whether A renders D obvious or A plus B renders D obvious. There's been a bit of confusion in the courts on this issue. Let me try to clarify that right here. I would disagree strenuously with the notion that Mr. McCrae is promulgating that the gram factors have to be applied in all cases for non-obvious or obviousness type double patenting. The reason it's called obviousness type double patenting is simply to distinguish it from same invention patenting. And obviousness analysis is not always required. I'll just give a couple of quick sites if I can get them out. The General Foods case that you mentioned in passing just now, it's cited in his brief as well, on 972F2nd at 1281 provides a fairly lengthy string site indicating that a standard 103 obviousness analysis is not always required. But how can you have a 103 obviousness analysis if you say the gram factors don't apply? I'm not sure. Is this essential to the position of the office? I think in this case, I think it's quite important. And you can sort of if you flip through the prosecution history, you'll see one of the examiners making a very good point. It doesn't make a lot of sense for us to say, well, what would somebody with skill in the art with a 235 patent be thinking in 1954? Would he have thought of the Nobel Prize winning invention described in the Italian application? You know, maybe not. But that's because we're not looking for a standard obviousness analysis as of the filing date of these admittedly Nobel Prize winning technology. We're looking to see whether he's going to get an unjustified monopoly. Again, to drive that point home, I point to Judge Rich and the Kaplan decision also recognize that there's a difference between 103 obviousness and this kind of patenting and a footnote footnote star. He said we prefer the term improper extension of monopoly rather than obviousness type double patenting. Are you saying that the MPEP revision that talks about obviousness type double patenting rejections is wrong? I am not. Well, it's section 804 of the MPEP that deals with that. It says since the analysis employed in an obviousness type double patenting determination parallels the guidelines for a 35 USC 103A rejection, the factual inquiry set forth in Graham v. John Deere that are applied for establishing a background, et cetera, et cetera, are employed when making an obviousness type double patenting analysis. I think that may be an overgeneralization, and I think the cases make it. Well, then it goes on to be more specific and says these factual inquiries are summarized as follows. A, determine scope and content. B, determine the differences. C, determine the level of ordinary skill. D, evaluate any objective indicia of non-obviousness. It is, I won't deny that it is the case that many obviousness type double patent cases follow a strict obviousness analysis. I've got a couple answers to this. One is to the extent that section of the MPEP requires consideration of the Graham factors is inconsistent with the decisions of this court, including- The applicant to know that the office is going to reject its own manual in a particular case and apply some other standard. The applicant is on notice that the office is always bound by the case law of the Federal Circuit, and that's the case that should govern this. Don't think our case law has contradicted that provision of the MPEP? Excuse me? You're saying our case law is contrary to that provision of the MPEP? Yes, I am, Your Honor. In another instance, I've cited the Kaplan case, the General Foods case, the String site there, including a site in Ray Sullivan case, Sutherland case, but there's also the relatively recent Geneva pharmaceutical case, but not one. But the MPEP hasn't been changed? Is the office goes its own way when it feels like it? Your Honor, I will check into that provision in the MPEP and find out. I know there is a revision that has just come out or is just about to come out, and I would hope that that issue was addressed. Just so you know what I was reading, I was looking at the eighth edition incorporating provision number five. Okay, thank you, Your Honor. Your Honor, the one other thing I want to remind the court when we consider even that issue is that some of these claims, as Mr. McRae acknowledged, involve anticipation. In other words, the 496 patent in every single case, the disclosure of the applied patent is specific to the issued patent. That's not double patenting. That's statutory double patenting, which isn't before us, right? That's not statutory because statutory requires the identical claim. So in other words, there are cases in non-obviousness type double patenting where we have anticipation, the epitome of obviousness, and that's what happens in 496, and there we don't need the Graham factors. I think that's a simple example. Is it your position that the board did or did not apply the Graham factors in the rejections at issue here? I will say I don't think they needed to in 496. As I just said, that was anticipation, the epitome. The other references, again, my position is I'm not sure they needed to, but just to go over those rejections specifically, there we have four different limitations in this claim. There are two monomer issues, the two co-monomers. There's the titanium-based catalyst part, and there's the aluminum-based catalyst part. So you can kind of look at those four limitations as to the claim at issue and the applied patents and look to see which one is more specific and which one is more general. As I said, the 496, it's more specific in the applied patent in every case. For some of the others, you have a generic. Mr. Krauss, as I mentioned earlier, rather than relying on policy, it seems to me you have to look claim by claim, and we could spend all day here. We don't have that time on so many of these rejections. But, for example, class group A, you've got an appealed claim comprising- Which prior art patent is group A? We're talking about prior art, quote prior art 235. Okay. Now that's a terp polymer, ethylene and an acetylene and a higher olefin. How does that render obvious a dimer comprising ethylene with an alpha olefin, not acetylene? How does an acetylenic tripolymer render a dipolymer, both olefins, obvious? In this case, it again comes down to the application of the obviousness type double patenting test. Here, the rejected claim includes the word comprising, which does not exclude an acetylenic component. So those very same terp polymers in the 235 patent would be covered. But you don't look at whether A renders B obvious by whether B dominates A. That's correct. And what you're saying is because B, or the claim at issue, is comprising, therefore it may be obvious over a claim that resides in acetylene. And I think that is correct, even under a proper obviousness analysis, simply because the scope of that claim is so broad. That scope has to be limited to exclude the acetylene. Don't you have to look at the specification in which the current claims arise? And I think it would be very hard to construe those claims as including acetylene. Well, under the broadest reasonable interpretation standard applied by the office, to serve the public notice function of the patent claiming system, we have an obligation to ensure that claims issue narrowly. If the claim- But wasn't that the obligation of the examiner during examination to say, all right, this is really on acetylene. It needs to be explicitly restricted rather than inferentially? Perhaps, and that would have been one response. And doesn't that get deference in the course of judicial proceedings? I don't think the claim construction of the examiner gets any deference in the course of judicial proceedings. The examiners aren't even attorneys, so I don't think that's the case. And in this case, the double patenting rejection wasn't raised until the reexamination, so the acetylene issue only came up then, but then the applicant had the opportunity to amend his claims to eliminate the acetylene component. Here's what's troubling. I mean, here this applicant is stuck in a 29-year interference and a lot of other proceedings which have taken us to where we are. Is that a valid reason for the office to take an issued patent and decide to review it? There was no request, I gather, from any competitor or the private sector? This was spontaneous on the part of the director? I don't have the internal history of that, but, yes, this was a director-ordered reexamination. As the reexamination order explains, we just realized that Mr. Netta has a lot of closely related patents that were never considered in the examination. Therefore, we need to consider them. And, again, the policy against double patenting is fundamentally at issue. This was before the examiner. They went back and forth. They had appeals as well as the lengthy interference. Just trying to understand at which stage an applicant, a patentee, can rely with moderate confidence. At least that the patent has gone through the examination procedure. They may have problems. These issues might have been raised in an infringement suit and a lot of other areas. But here there's the office that's considered the issues and now says, well, we made a mistake years ago. Without any sense that there is an adversarial relationship someplace affecting this spontaneous action by the director. I don't think there's any bright-line rule. We just have to go back to the reexamination statute and the policies behind the reexamination statute, which are to allow the PTO to correct errors that have occurred in the examination of a patent. We have to assume errors do occur and to remove bad patents from existence. They don't impose an undue burden on the public. I think it is fair to remember that the examiners do make errors and that those errors should be correctable by the patent office. There's a great quote in the Black Light Power case that was decided after Portola that recognizes exactly that. The complexity of the examination process and the potential for error in any human activity way on the side of according to PTO latitude in that case. But a similar rationale applies when an error in examination is detected, even if it's a 46-year examination. And I think if you read the board decision, you'll see that the applicant did not approach this with entirely clean hands, if that's the right word. Maybe that's an overstatement. And as the specific example, we can cite to the way that Vandenberg referenced it. I'm going to have to interrupt you because we're well out of time.  Thank you, Your Honor. Mr. McRae, would you acknowledge Mr. McRae's time by the amount we've run over? Thank you, Your Honor. Just a couple of comments. Portola clearly addressed and stated if the reference was considered, if it was before the PTO, that's it. It's overdone. With regard to his solicitor's unjustified time-wise extension, it has to be unjustified. There's no per se rule to granting a broader patent or an overlapping patent. Stanley, Calvert, Bora, Kaplan, Bratt, General Foods, that's not the standard. To make it unjustified, you have to say when you apply the obviousness test, is this patent obvious in view of that one? And if it is, if it is of obvious variation, then that is unjustified. They didn't do that. They never considered the elements or the relevant factors. They simply looked at the claims in hindsight analysis and said, this is obvious to me, that's good enough. That's how it's got to be carried out. That's when it's unjustified. In addition, the comments on the 496 anticipating claims, the 496 didn't even exist. There has to be careful analysis when there's discussion of anticipation because that would also take into obviously requirements for enablement. If a reference is going to be anticipatory or if a claim is going to be anticipatory. These claims do not have enough information in them, no way. The specs did, but that claim didn't even exist. I think there's a little confusion on that. I would like to also point out that what wasn't raised here, there was apparently a little bit of a quote from General Foods. General Foods is one of the cases we cite in our reply brief, especially pages 13 or 14. There's a litany of cases. Every single one says in a double patenting analysis, you've got to consider the obviousness factors, the Graham factors, and go through them even if there is just for and consider the art, just to show the level of skill and why this claim would render that claim or a variation of it obvious. But, you know, the PTO makes obviousness rejections all the time. And my experience or recollection is they don't go through Graham analysis very often. And so it's almost an established practice that when it gets to district courts, they go through a Graham analysis, but the Patent Office doesn't really do that. Am I wrong? You're not wrong. That doesn't mean that they are not required to do it. They are required to do it. That's why, for example, Kaplan says, and there's a very clear statement, there's got to be some prior art that you're relying on to show where they're going. Eli Lilly, this court did not go to the specification. It went to an older Merck index. It would have been much easier to go to the specification and pluck hydrochloride out and plug it into salt to knock out hydrochloride in a claim. Talking about hydrochloride and an obviousness situation isn't a very good ground to rely on. I understand. My point is that you have to consider all the factors. And if you're going to have something, you've got to say, this is what the art was showing. This is why someone would make the modification. The claim is not before them, so someone, for example, seeing it for the first time, would have to rely on something. Your Honors, if you have no further questions. Thank you very much, Your Honors. Thank you. Thank you, Mr. McRae and Mr. Krause.